## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| IAN WRIGHT, | ) | 3:21-CV-104 (SVN) |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SNYDER, | ) | |
| *Defendant*. | ) | September 30, 2023 |

<u>**ORDER AND RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**</u>

Sarala V. Nagala, United States District Judge.

Plaintiff Ian Wright filed a *pro se* complaint pursuant to 42 U.S.C. § 1983, alleging that, while he was housed at Corrigan-Radgowski Correctional Institution ("Corrigan-Radgowski"), Defendant Stephen Snyder, a correctional officer employed by the Connecticut Department of Corrections ("DOC"), conducted an unjustified search of his cell and destroyed his personal property. Plaintiff claims that Defendant conducted this search in retaliation for Plaintiff's complaints regarding various correctional officers' noncompliance with the DOC's COVID-19 precautions, in violation of the First Amendment. Defendant moves for summary judgment on the grounds that Plaintiff has not exhausted his administrative remedies and that there are no genuine disputes of material fact with respect to the merits of Plaintiff's First Amendment claim. For the reasons that follow, the Court finds genuine disputes of material fact as to both issues, and thus DENIES Defendant's motion for summary judgment.

## I.       FACTUAL BACKGROUND

The record reveals the following facts, most of which are disputed. The parties do agree that, at the relevant time, Plaintiff was housed at Corrigan-Radgowski and Defendant was a correctional officer employed by the DOC. Pl.'s Local Rule ("L.R.") 56(a)2 Statement ("St."), ECF No. 90, ¶¶ 1–2. They further agree that, on September 25, 2020, Defendant conducted a

search of Plaintiff's cell after Plaintiff exited his cell for medication distribution wearing blue pajamas, *see id.* ¶¶ 15–16, 18–19.  Aside from these limited facts, the parties' accounts diverge significantly.

Defendant was assisting a nurse with the distribution of medication to inmates when Plaintiff exited his cell wearing the pajamas.  *Id.* ¶¶ 15–16.  The parties dispute whether Plaintiff was permitted to wear the pajamas and whether Defendant asked Plaintiff if he had proper inmate clothing.  *Compare* Def.'s Decl., ECF No. 84-7, ¶¶ 6, 8, *with* Pl.'s L.R. 56(a)2 St. ¶¶ 16–17.  Defendant then conducted the search of Plaintiff's cell.  *See* Pl.'s L.R. 56(a)2 St. ¶¶ 18–19.  Defendant contends that he had never interacted with Plaintiff before the evening of the search, Def.'s Decl. ¶ 7, but Plaintiff contends that he and Defendant had numerous prior interactions, Pl.'s L.R. 56(a)2 St. ¶ 13.

Defendant claims that he conducted the search to verify that Plaintiff in fact possessed proper inmate clothing, Def.'s Decl. ¶ 9, while Plaintiff contends that Defendant conducted the search in retaliation for grievances Plaintiff had submitted throughout the spring and summer of 2020, related requests for preservation of video footage he had submitted throughout that time, and a lawsuit Plaintiff had filed on September 1, 2020.  Pl.'s L.R. 56(a)2 St. ¶¶ 18–19; *Wright v. Cooke*, Civ. No. 3:20-cv-1284 (SVN); *see generally* ECF Nos. 91 at 17–34, 91-1 at 13–37.  Plaintiff avers that Defendant made comments about Plaintiff's grievances, lawsuit, and requests to preserve video footage before searching his cell, such as, "you think you[']r[e] smart filing grievances and law suits against us," and "you want to watch us[,] well we are watching you all."  Pl.'s Decl., ECF No. 91, ¶¶ 17–18.  Defendant responds that he did not know of any grievances or lawsuits filed by Plaintiff.  Def.'s Decl. ¶ 7.

2

The parties also disagree as to what occurred during the search.  Plaintiff claims that, as a result of Defendant's activities during the search, his personal property was damaged, including by water.  Pl.'s L.R. 56(a)2 St. ¶¶ 19–20.  Plaintiff further claims that, after the search, his cell was in "complete disarray and looked like a disaster zone," his personal items were drenched in water on the cell floor, and his boombox was no longer working.  Pl.'s Decl. ¶¶ 26, 31. Defendant contends that none of Plaintiff's property was damaged in any way during the search, and that no water was discharged in Plaintiff's cell.  Def.'s Decl. ¶ 14.

## II.    PROCEDURAL HISTORY

In January of 2021, Plaintiff filed the present action asserting, among others, a First Amendment retaliation claim.  *See generally* Compl., ECF No. 1.  Following an Initial Review Order, Plaintiff's First Amendment claim proceeded against Defendant in his individual capacity, and all other claims were dismissed.[1]  After the close of discovery, Defendant filed the present motion for summary judgment, ECF No. 84.  Defendant seeks summary judgment for two reasons: first, because Plaintiff failed to exhaust his administrative remedies; and second, because there are no genuine disputes of material fact with respect to Plaintiff's First Amendment claim.

## III.   LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides, in relevant part, that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  A disputed fact is material only where the determination of the fact might affect the outcome of the lawsuit.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  With respect to genuineness, "summary judgment will not lie if the

---

[1] Plaintiff also claimed that, prior to the search, Defendant conducted a pat-down of Plaintiff without wearing a mask in violation of the Eighth Amendment, and that claim proceeded against Defendant in his individual capacity following the Court's Initial Review Order.  ECF No. 12 at 31–32.  During discovery, Plaintiff voluntarily withdrew his Eighth Amendment claim, ECF Nos. 76, 80, and, accordingly, only his First Amendment claim remains live.

dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden of establishing there is no genuine issue of material fact in dispute will be satisfied if the movant can point to an absence of evidence to support an essential element of the non-moving party's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears an initial burden of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323. A movant, however, "need not prove a negative when it moves for summary judgment on an issue that the [non-movant] must prove at trial. It need only point to an absence of proof on [the non-movant's] part, and, at that point, [the non-movant] must 'designate specific facts showing that there is a genuine issue for trial.'" *Parker v. Sony Pictures Ent., Inc.*, 260 F.3d 100, 111 (2d Cir. 2001) (quoting *Celotex Corp.*, 477 U.S. at 324). The non-moving party, in order to defeat summary judgment, must come forward with evidence that would be sufficient to support a jury verdict in his or her favor. *Anderson*, 477 U.S. at 249. If the non-movant fails "to make a sufficient showing on an essential element of [their] case with respect to which [they have] the burden of proof," then the movant will be entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 323.

In considering a motion for summary judgment, a court "must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Kee v. City of New York*, 12 F.4th 150, 158 (2d Cir. 2021) (citation and internal quotation marks omitted). "Only when reasonable minds could not differ as to the

import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991).

Moreover, the Court bears in mind that a *pro se* litigant's filings must be liberally construed to raise the strongest arguments they suggest. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013); *see also Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010) (collecting cases regarding the "special solicitude" afforded to *pro se* litigants).

## IV.   EXHAUSTION OF ADMINSITRATIVE REMEDIES

### A.   Legal Standard

#### 1.   *The Prison Litigation Reform Act*

The Prison Litigation Reform Act ("PLRA") requires that all inmates exhaust available administrative remedies before filing a federal lawsuit related to prison conditions. 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."). The exhaustion requirement applies to all claims regarding "prison life, whether they involve general circumstances or particular episodes." *Porter v. Nussle,* 534 U.S. 516, 532 (2002). In addition, the exhaustion requirement applies regardless of whether the administrative procedure provides the relief that the plaintiff seeks. *See Booth v. Churner*, 532 U.S. 731, 741 (2001).

Exhaustion of administrative remedies serves "two main purposes." *Woodford v. Ngo*, 548 U.S. 81, 89 (2006) (addressing exhaustion requirements under the PLRA). First, exhaustion gives an agency "an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court, and it discourages disregard of the agency's procedures." *Id.* (cleaned up). Second, exhaustion promotes efficiency because "[c]laims can be resolved much

more quickly and economically in proceedings before an agency than in litigation in federal court." *Id.* Relatedly, the exhaustion requirement promotes efficiency even when the controversy "survives administrative review" because the administrative procedure often produces "a useful record for subsequent judicial consideration." *Id.* (citation and internal quotation marks omitted). *Accord Jones v. Bock*, 549 U.S. 199, 218 (2007) (identifying "the preparation of a useful record" as a benefit of the exhaustion requirement).

The PLRA requires "proper exhaustion," meaning a plaintiff must exhaust all available remedies in "compliance with an agency's deadlines and other critical procedural rules." *Woodford*, 548 U.S. at 90. The applicable procedural rules "are defined not by the PLRA, but by the prison grievance process itself." *Jones*, 549 U.S. at 218. "Although a plaintiff need not specifically articulate his claims in grievances in the exact same manner that he articulates them in federal court, he is required to give notice to the defendants about the factual basis of his claims." *Edwards v. Melendez*, 832 F. App'x 50, 54 (2d Cir. 2020) (summary order). *See also Demuth v. White*, No. 9:18-CV-915 (MAD/CFH), 2020 WL 1030649, at *4 (N.D.N.Y. Mar. 3, 2020) (explaining that a plaintiff's claim may be unexhausted when the plaintiff "fails to fairly raise [their] claims in the grievance"). To properly exhaust a claim, "a prisoner must allege facts sufficient to alert corrections officials 'to the nature of the claim,' and 'provide enough information about the conduct' at issue 'to allow prison officials to take appropriate responsive measures.'" *Singh v. Lynch*, 460 F. App'x 45, 47 (2d Cir. 2012) (summary order) (quoting *Johnson v. Testman*, 380 F.3d 691, 697 (2d Cir. 2004)). If a plaintiff does not provide such description or notice, correctional officials are not afforded the "opportunity to address complaints internally," which stymies the purposes of the exhaustion requirement. *Porter*, 534 U.S. at 525. Put simply, "untimely or otherwise procedurally defective attempts to secure administrative remedies do not

satisfy the PLRA's exhaustion requirement." *Ruggiero v. Cnty. of Orange*, 467 F.3d 170, 176 (2d Cir. 2006).

Although special circumstances generally will not relieve an inmate of his or her obligation to exhaust, the exhaustion requirement may be excused when the administrative remedy is "officially on the books" but not available in practice. *Ross v. Blake*, 578 U.S. 632, 642–43 (2016). An inmate is required "to exhaust those, but only those, grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of.'" *Id.* at 642 (quoting *Booth*, 532 U.S. at 738). The U.S. Supreme Court has identified three circumstances in which an administrative remedy is considered unavailable: (1) "when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) when a procedure is "so opaque that it becomes, practically speaking, incapable of use"; or (3) "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 643–44. "Whether an administrative remedy was available to a prisoner in a particular prison or prison system is ultimately a question of law, even when it contains factual elements." *Hubbs v. Suffolk Cnty. Sheriff's Dep't*, 788 F.3d 54, 59 (2d Cir. 2015).

Because failure to exhaust administrative remedies is an affirmative defense, the defendant bears the burden of proving that the plaintiff did not exhaust his administrative remedies. *See Jones*, 549 U.S. at 216; *Burton v. Salerno*, No. 3:20-cv-1926 (VAB), 2023 WL 184238, at *6 (D. Conn. Jan. 13, 2023); *Sease v. Phillips*, No. 06 CIV. 3663 (PKC), 2008 WL 2901966, at *4 (S.D.N.Y. July 24, 2008). Once this burden is met, the plaintiff must show that he did exhaust his administrative remedies or that the administrative remedy is not available in practice. *See Smith*

*v. Kelly*, 985 F. Supp. 2d 275, 284 (N.D.N.Y. 2013) (citing *Murray v. Palmer*, No. 903-CV-1010 GTS/GHL, 2010 WL 1235591, at *4 (N.D.N.Y. Mar. 31, 2010)).

2.   *Connecticut Department of Correction Administrative Remedies*

The administrative remedies for the Connecticut DOC are set forth in Administrative Directive 9.6.   Claims relating to conditions of confinement are subject to the requirements of Directive 9.6.   *See Silva v. Kilham*, No. 3:19-CV-01719 (VLB), 2020 WL 7388960, at *5 (D. Conn. Dec. 16, 2020).   The parties submitted the version of Administrative Directive 9.6 that was in effect at the time of the search of Plaintiff's cell.   *See* Administrative Directive 9.6, Inmate Administrative Remedies (revised August 15, 2013), ECF No. 84-4 (version in effect at the time of the incident, submitted by Defendant), ECF No. 91-5 at 25 (same version, submitted by Plaintiff).

Under Administrative Directive 9.6, an inmate is required to first attempt to resolve the matter informally.   Specifically, an inmate can attempt to verbally resolve the issue with an appropriate staff member or supervisor.   *See* ECF No. 84-4 at 9.6(6)(A).   If the attempts to resolve the matter verbally are not effective, the inmate can make a written request for informal resolution by sending an Inmate Request Form (CN 9601) to the appropriate staff member.   *See id.*   The form must "clearly state the problem and the action requested to remedy the issue."   *See id.*   Correctional staff are required to respond to a written request form within fifteen business days of receipt.   *See id.*

If an inmate does not receive a response to the written request within fifteen business days or if the inmate is not satisfied with the response to his request, the inmate can file a Level 1 grievance (CN 9602).   *See* ECF No. 84-4 at 9.6(6)(C).   The Level 1 grievance must be filed within thirty calendar days from the date of the occurrence or discovery of the cause of the grievance, and

the inmate must include a copy of the correctional staff's response to his Inmate Request Form or explain why the response is not attached. *See id.* The Unit Administrator must respond in writing to the Level 1 grievance within thirty business days of his or her receipt of the grievance. *See* ECF No. 84-4 at 9.6(6)(I). The grievance can be returned without disposition, rejected, denied, compromised, upheld, or withdrawn. *See* ECF No. 84-4 at 9.6(6)(D) & (E). A return without disposition means "that the grievance has not been properly filed," which occurs when an inmate failed to attempt informal resolution, failed to explain why the correctional staff's response to his Inmate Request Form is not attached, or otherwise failed to comply with Administrative Directive 9.6. *See* ECF No. 84-4 at 9.6(6)(E). Following a return without disposition, and the inmate can re-file the grievance after correcting the error. *See id.*

The procedures further provide that the inmate can appeal the Unit Administrator's disposition of the Level 1 grievance, or the Unit Administrator's failure to dispose of the grievance in a timely manner, through a Level 2 grievance. *See* ECF No. 84-4 at 9.6(6)(G), (I), (K). An inmate cannot, however, appeal a Level 1 grievance that was returned without disposition due to a failure to comply with the Administrative Directive 9.6. *See* ECF No. 84-4 at 9.6(6)(G). A Level 2 grievance filed by an inmate confined in a Connecticut correctional facility is reviewed by the appropriate District Administrator. *See* ECF No. 84-4 at 9.6(6)(K)(1). In certain circumstances, an inmate may also appeal the District Administrator's disposition of his Level 2 grievance by way of a Level 3 grievance, reviewed by the Commissioner of the DOC or his designee. *See* ECF No. 84-4 at 9.6(6)(L).

B. <u>Discussion</u>

Relevant to exhaustion of remedies, Defendant argues that "the sole issue raised in [Plaintiff's] grievances pertained to [Defendant] failing to wear face coverings while conducting

a pat down search," which Defendant claims did not sufficiently alert the DOC as to the nature of Plaintiff's retaliation claim arising from the cell search and alleged destruction of property. Def.'s Br., ECF No. 84-1, at 8. The problem with this argument is that the very records Defendant has submitted in support of his motion, attached to a declaration by Corrigan-Radgowski's Grievance Coordinator, demonstrate that Plaintiff in fact *did* initiate the grievance process related to his retaliation claim by filing an Inmate Request Form on September 28, 2020. *See* Jacaruso Decl., ECF No. 84-6 at 4–5. In that Inmate Request Form, Plaintiff alleged that, following Defendant's search of his cell, his cell was "in complete disarray" and his property was damaged, and he explained that he believed Defendant's search was retaliatory. *Id.* The relief he requested pertained to both the retaliatory cell search and Defendant's alleged failure to wear a mask or face covering while conducting the search: "I request that the appropriate action be taken against the above mentioned officer for the adveres (*sic.*) actions against me and against C/O Snyder for not wearing a mask or face covering when he came into contact with me placing my health and well being in jeopary (*sic.*)." *Id.* at 5.

From Defendant's own submission, it is apparent a DOC official responded to the Inmate Request Form on October 16, 2020. *Id.* at 4. The official stated that he had reviewed the video of the cell search and concluded that the cell was "routinely shaken down." *Id.* at 4. He further stated he "could not confirm the condition of [Plaintiff's] cell from the camera's view after the shakedown was conducted." *Id.* The records submitted by Defendant do not contain any Level 1 or Level 2 grievances filed by Plaintiff after rejection of the September 28, 2020, Inmate Request Form.

Plaintiff, however, has supplied evidence that he filed a Level 1 grievance relating to the alleged retaliation on October 23, 2020, following receipt of the DOC official's October 16, 2020,

response to his Inmate Request Form.  ECF No. 91-2 at 27–28.[2]  The Level 1 grievance is approximately three paragraphs long, excluding the two-line request for resolution.  *Id.*  It opens by stating, in no uncertain terms, that he was filing the grievance against officers "*who entered into a conspiracy to retaliate against me* because I complained, submitted requests, filed grievances, and a law suit against prison officials here at Corrigan C.C., for their refusal to adhere to the CDC and DOC guidelines and/or policy related to COVID-19 and related issues, concerning wearing mask or face covering and practice social distancing."  *Id.* at 27 (emphasis added).  Plaintiff went on to describe his version of Defendant's cell search, including Defendant's comments about Plaintiff's grievances and lawsuits that led him to believe the search and destruction of property were retaliatory.  He requested that "the appropriate actions be taken against the named prison officials and that they be held accountable for their misconduct."  *Id.* at 28.  Certainly, this grievance put the prison on notice of Plaintiff's retaliation claim.

Plaintiff has also supplied the following additional evidence regarding his efforts to exhaust administrative grievances.  On October 26, 2020, his October 23, 2020, Level 1 grievance was returned without disposition for two reasons: first, because each "grievable matter" must be submitted on a separate Level 1 grievance form, and, second, because the grievance and action request must be "stated simply and coherently."  *Id.* at 29.  On October 28, 2020, Plaintiff re-submitted his Level 1 grievance in substantially identical form, *id.* at 30–31, and, on November 10, 2020, it was again returned without disposition for the same two reasons, *id.* at 35.  Meanwhile, on November 6, 2020, Plaintiff re-submitted his Level 1 grievance again, in largely the same form, but this time with additional details about how he had attempted informal resolution.  *Id.* at 37–38.

---

[2] The Court observes that Plaintiff has also submitted his Property Claim relating to the alleged damage to his property, which was denied because his claims could not be substantiated, *see* ECF No. 91-3 at 13, 15, but it is not clear that this claim has any bearing on his exhaustion of the administrative procedures set forth in Administrative Directive 9.6.

On November 19, 2020, this grievance was returned without disposition for the second reason previously identified—the grievance and action request must be stated simply and coherently, *id.* at 41.  On November 23, 2020, Plaintiff filed a Level 2 grievance, but, on December 14, 2020, it was returned without disposition because his Level 1 grievances that had been returned without disposition were not appealable under Administrative Directive 9.6(6)(G).  *Id.* at 42.

Defendant has seemingly ignored these additional grievance filings, as he makes no mention of any of them in his brief and they are not included in the Grievance Coordinator's declaration, which purports to include *all* grievances filed by Plaintiff between October of 2019 and October of 2021, Jacaruso Decl., ECF No. 85-4, ¶¶ 5–6.  Defense counsel did not deign to file a reply brief addressing Plaintiff's submission of the various grievances.  In representing to the Court that Plaintiff had filed no grievances related to alleged retaliation, defense counsel was, at best, negligent in initially failing to review the records he submitted in support of Defendant's motion, and in later failing to conduct a search for all related grievances, in order to correct the record after Plaintiff attached the grievances to his opposition brief.  At worst, defense counsel intentionally mischaracterized the record in an attempt to mislead the Court into believing that Plaintiff did not attempt to exhaust administrative remedies as to the alleged retaliation.  Either way, the Court finds defense counsel's conduct quite troubling.[3]

The question that remains is whether Defendant has sustained his burden of showing that there is no genuine dispute that Plaintiff did not exhaust administrative remedies relevant to the alleged retaliation.  Because defense counsel did not address his client's exhaustion argument to the relevant grievance forms, the Court would be well within its discretion to conclude that

---

[3] This is not the first instance in this case where defense counsel's lack of diligence in defending this action has been recognized by the Court.  *See* ECF No. 68 (describing defense counsel's lack of diligence in failing to investigate an issue related to preserved video recordings).

Defendant failed to meet this burden.  *See Jones*, 549 U.S. at 216 (concluding that "failure to exhaust is an affirmative defense under the PLRA"); *Burton*, 2023 WL 184238, at *6 ("Exhaustion of administrative remedies is an affirmative defense.  Thus, the defendants bear the burden of proof.").  The Court has no obligation "to perform an independent review of the record" to resolve a motion for summary judgment.  *Amnesty Am. v. Town of West Hartford*, 288 F.3d 467, 470 (2d Cir. 2002). *See also Swinton v. Wright*, 776 F. App'x 721, 723 (2d Cir. 2019) (summary order) (affirming a district court's ruling on summary judgment notwithstanding evidence in the record the litigant never brought to the court's attention); *Tracey v. Dep't of Soc. Servs.*, No. 3:17-cv-745 (KAD), 2019 WL 2526299, at *2 (D. Conn. June 19, 2019) (admonishing a litigant for attaching documents and transcripts without directing the court to specific citations in the record).  Moreover, the special solicitude afforded to *pro se* litigants would counsel against prejudicing Plaintiff by finding that grievance forms *he* submitted to the Court demonstrate he did not properly exhaust his claim.  *See Tracy*, 623 F.3d at 101 (explaining that special solicitude is afforded to a *pro se* litigant because he "is likely to forfeit important rights through inadvertence if he is not afforded some degree of protection").

Nonetheless, the Court begrudgingly agrees with Defendant that Plaintiff has not properly exhausted his retaliation claim.  From the evidence submitted by Plaintiff himself, it appears undisputed that he failed to file a Level 1 grievance that complied with Administrative Directive 9.6 and, thus, failed to properly exhaust each step of the administrative process available to him.  Exhaustion of administrative remedies is a mandatory requirement to maintain a civil action under the PLRA, *Porter*, 534 U.S. at 524, and it effectuates the important congressional purpose of giving the agency an opportunity to correct its own mistakes, *Woodford*, 548 U.S. at 89.  "This is particularly important in relation to state corrections systems because it is 'difficult to imagine an

activity in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures, than the administration of its prisons.'" *Woodford*, 548 U.S. at 94 (quoting *Preiser v. Rodriguez*, 411 U.S. 475, 491–492 (1973)). Accordingly, the PLRA mandates that "the prison grievance system is given a fair opportunity to consider" grievances that fully comply with "the system's critical procedural rules." *Id.* at 95. The Court will not disregard this statutory mandate here. While defense counsel did not adequately brief the issue, he supplied the relevant Inmate Request Form, and, in response, Plaintiff has not shown that he pursued every level of administrative review available to him.

That does not end the exhaustion inquiry, however. Plaintiff contends that his "exhaustion efforts were obstructed and/or thwarted" by the DOC staff who repeatedly returned his grievances without disposition. Pl.'s Br. at 10. As noted above, an administrative remedy is considered unavailable: (1) "when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) when a procedure is "so opaque that it becomes, practically speaking, incapable of use"; or (3) "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Ross*, 578 U.S. at 643–44.

While there does not appear to be evidence in the record suggesting that the second or third of the *Ross* exceptions apply here, the Court holds that there are genuine issues of material fact concerning whether prison staff's repeated return of Plaintiff's Level 1 grievances without disposition resulted in the grievance procedure operating "as a simple dead end." *Id.* Plaintiff's Level 1 grievances were all rejected by the same Administrative Remedies Coordinator at least in part because they purportedly did not state "the grievance and the action requested . . . simply and

coherently." ECF No. 91-2 at 29, 35, 41. Then, Plaintiff's Level 2 grievance was rejected because his Level 1 grievances had been previously returned without disposition. *Id.* at 41. A reasonable jury examining these grievance submissions could conclude that the prison was consistently unwilling to provide him any relief, despite his best efforts to comply with the grievance procedures.

Defendant insinuates that Plaintiff is a serial grievance filer, stating that he "filed numerous inmate request forms and grievances, concerning sundry issues." Def.'s Br. at 7. A reasonable jury could consider whether prison officials were motivated to reject Plaintiff's grievances regarding the alleged retaliation simply because he complained frequently about many issues. As to the assertion that the grievances were not stated simply and coherently, a reasonable jury could conclude otherwise: each grievance was clearly stated in typewritten form, contained approximately three to four average-length paragraphs describing his alleged protected activity and the allegedly retaliatory cell search and destruction of property, and specifically set forth the relief requested in two succinct lines. *See* ECF No. 91-2 at 27–28, 31–32, 37–38. While Plaintiff did not edit the Level 1 grievances much, if at all, after receiving repeated feedback that they were not sufficiently simple and coherent, that is a matter a jury could weigh in deciding whether administrative remedies were effectively unavailable to Plaintiff, but it is not a reason to grant summary judgment.

In sum, while Plaintiff did not exhaust administrative remedies, it is clear that a genuine issue of material fact exists as to whether an exception to the exhaustion requirement should apply. Summary judgment on the ground of exhaustion of remedies is therefore inappropriate.

## V.     FIRST AMENDMENT

In light of its conclusion that summary judgment for failure to exhaust is inappropriate, the Court proceeds to consideration of whether there is a genuine dispute of material fact, and whether Defendant is entitled to judgment as a matter of law, concerning the merits of Plaintiff's First Amendment Claim.

### A.   Legal Standard

This claim arises under 42 U.S.C. § 1983, which "provides a private right of action against any person who, acting under color of state law, causes another person to be subjected to the deprivation of rights under the Constitution or federal law." *Blyden v. Mancusi*, 186 F.3d 252, 264 (2d Cir. 1999) (citing § 1983).  The First Amendment to the U.S. Constitution, applicable to the states through the Fourteenth Amendment, protects prison inmates from retaliation by prison officials.  *See Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996).  "Courts properly approach prisoner retaliation claims 'with skepticism and particular care,' because 'virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.'" *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003) (quoting *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)). *See also Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003) (quoting *Dawes*, 239 F.3d at 491, for the proposition that, "because prisoner retaliation claims are 'easily fabricated,' and accordingly 'pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration,'" the plaintiff must put forth "non-conclusory allegations" of retaliation).

To prevail on a First Amendment retaliation claim, a plaintiff must demonstrate: "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the

plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004) (quoting *Dawes*, 239 F.3d at 492); *accord Brandon v. Kinter*, 938 F.3d 21, 40 (2d Cir. 2019).

    B.  <u>Discussion</u>

        *1.  Protected Activity*

The Second Circuit has long viewed the filing of prison grievances as a protected activity satisfying the first element of a First Amendment retaliation claim. *Davis*, 320 F.3d at 352 (reasoning that the plaintiff who filed a grievance against the prison official sufficiently satisfied the first element, "[s]ince the filing of prison grievances is a constitutionally protected activity"); *Graham*, 89 F.3d at 80 (same); *Brandon*, 938 F.3d at 40 (same).

Defendant does not meaningfully dispute that Plaintiff engaged in a protected activity. *See* Def.'s Br. at 9 (assuming that Plaintiff engaged in protected conduct). Indeed, Plaintiff has shown that, between April and August of 2020, he filed at least sixteen grievances—specifically, four Inmate Request Forms, seven Level 1 grievances, and five Level 2 grievances—relating to perceived COVID-19 protocol violations by correctional officers. ECF No. 91 at 17, 20, 24, 28, 34, 42; ECF No. 91-1 at 13, 14, 21, 27, 31, 36; ECF No. 84-6 at 19, 22, 24, 27. Plaintiff's grievance closest in time to his cell search was a Level 2 grievance he submitted on July 7, 2020, which was rejected on August 21, 2020. ECF No. 91-1 at 27.

In addition, between May and September of 2020, Plaintiff sent six video preservation requests to Corrigan-Radgowski's FOI Liaison, all of which were completed in that same time frame. ECF No. 91-2 at 2–7. The parties have not identified any cases considering whether requests for preservation of video footage constitute protected conduct for First Amendment purposes. Nevertheless, a reasonable jury could infer that Plaintiff's video preservation requests

pertained to conduct by correctional officers that was the subject of his grievances. Notably, there is a genuine dispute of fact as to whether Defendant, prior to searching Plaintiff's cell, made comments about Plaintiff's grievances *and* his video preservation requests. *See* Pl.'s Decl. ¶¶ 17–18 (Plaintiff attesting that Defendant said "you think you[']r[e] smart filing grievances and law suits against us," and "you want to watch us[,] well we are watching you all"). From this, a reasonable jury could find that Plaintiff was requesting to preserve video footage of correctional officers failing to comply with the DOC's COVID-19 protocols and committing other misconduct to support his grievances. This would bring the video preservation requests within the ambit of Plaintiff's protected conduct of filing grievances.

Finally, Plaintiff's filing of a federal lawsuit on September 1, 2020, *see Wright v. Cooke*, Civ. No. 3:20-cv-1284 (SVN), is quintessential protected activity under the First Amendment. *See Colombo v. O'Connell*, 310 F.3d 115, 118 (2d Cir. 2002); *Everitt v. DeMarco*, 704 F. Supp. 2d 122, 132 (D. Conn. Mar. 30, 2010) ("It is well-established that the filing of a lawsuit . . . is constitutionally protected by the First Amendment.").

### 2. Adverse Action

The Court finds there are genuine disputes of material fact regarding the second element of Plaintiff's First Amendment retaliation claim: whether Plaintiff suffered an adverse action due to the cell search and alleged destruction of property. The Second Circuit has "defined 'adverse action' *objectively*, as retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights.'" *Gill*, 389 F.3d at 381 (quoting *Davis*, 320 F.3d at 346) (emphasis in original). If the defendant's action does not have this deterring effect, "the retaliatory act is simply *de minimis* and therefore outside the ambit of constitutional protection." *Dawes*, 239 F.3d at 493. The court's inquiry "must be tailored to the different

circumstances in which retaliation claims arise, bearing in mind that prisoners may be required to tolerate more than average citizens before a retaliatory action taken against them is considered adverse." *Nelson v. McGrain*, 596 F. App'x 37, 38 (2d Cir. 2015) (summary order) (quoting *Davis*, 320 F.3d at 353).

In the Fourth Amendment context, the U.S. Supreme Court has held that an unauthorized cell search does not implicate a prisoner's right to be free from unreasonable searches because a prisoner has no reasonable expectation of privacy in their cell. *Hudson v. Palmer* 468 U.S. 517, 526 (1984) ("[S]ociety is not prepared to recognize as legitimate any subjective expectation of privacy that a prisoner might have in his prison cell.").  In light of *Hudson*, courts in this Circuit have routinely held that a retaliatory cell search, standing alone, does not constitute an adverse action for the purpose of a First Amendment retaliation claim.  *See, e.g.*, *Harnage v. Brighthaupt*, No. 3:12-CV-1521 (AWT), 2016 WL 10100763, at *6 (D. Conn. June 3, 2016) (collecting cases for the proposition that "a retaliatory cell search is insufficient to support a First Amendment retaliation claim" under *Hudson*), *aff'd*, 720 F. App'x 79 (2d Cir. 2018) (summary order); *Battice v. Phillip*, No. CV-04-669 (FB) (LB), 2006 WL 2190565, at *7 (E.D.N.Y. Aug. 2, 2006) (reasoning that, under *Hudson*, "a prisoner has no reasonable expectation of privacy in his or her prison cell; therefore, a search of an inmate's cell, even for retaliatory reasons, . . . does not implicate a constitutional right"); *Salahuddin v. Mead*, No. 95 CIV. 8581 (MBM), 2002 WL 1968329, at *5 (S.D.N.Y. Aug. 26, 2002) ("At the very least, *Hudson* supports the proposition that a cell search is different from the various administrative decisions that are actionable under § 1983 if they are retaliatory.").

But several courts in this Circuit have held that wrongful conduct occurring in the course of a retaliatory cell search *can* constitute an adverse action for purposes of a First Amendment

retaliation claim if that conduct would meaningfully deter a prisoner from engaging in a protected activity. *Rodriguez v. McClenning*, 399 F. Supp. 2d 228, 239–40 (S.D.N.Y. 2005) (explaining that, although the plaintiff "had no constitutional right to be free from cell searches of any kind, including retaliatory searches," he could maintain a retaliation claim for the defendant's allegedly retaliatory conduct "*in conjunction* with the cell search" (emphasis added)); *Phelan v. Thomas*, No. 9:10-CV-11 (GLS/DJS), 2017 WL 519246, at *3 (N.D.N.Y. Feb. 8, 2017) ("Adverse action, as it relates to a retaliatory cell search, requires more than a search alone. . . . Indeed, the plaintiff must demonstrate a search and 'other wrongful conduct,' such as the destruction or confiscation of property, that evinces the requisite deterrent of a similarly situated inmate of ordinary firmness from exercising his or her constitutional right." (citation omitted)); *Stewart v. Richardson*, No. 15 CV 9034 (VB), 2016 WL 7441708, at *5 (S.D.N.Y. Dec. 27, 2016) (holding that a plaintiff stated a retaliation claim arising from the defendant's allegedly retaliatory cell search and destruction of personal property).

While the Second Circuit has not addressed this issue directly, other circuit courts have concurred that other wrongful conduct accompanying a cell search can give rise to a retaliation claim. In *Wright v. Newsome*, 795 F.2d 964, 968 (11th Cir. 1986), the Eleventh Circuit held that the plaintiff's allegations of a retaliatory cell search and destruction of personal property "might not otherwise be offensive to the Constitution," but nevertheless stated a violation of his First Amendment rights. And in *Bell v. Johnson*, 308 F.3d 594, 605 (6th Cir. 2002), the Sixth Circuit held that the plaintiff's evidence that the defendants "twice left the plaintiff's cell in disarray" and confiscated his personal property demonstrated an adverse action for the purpose of a First Amendment retaliation claim.

Here, Plaintiff has demonstrated more than just a retaliatory cell search; he also attests that Defendant left his cell in disarray and drenched his personal items—such as his boombox, clothes, mattress, and legal materials—in water, which effectively destroyed the boombox. Viewing these actions collectively, a reasonable jury could find that Defendant's conduct was not merely *de minimis*, but rather would deter a "similarly situated" prisoner "of ordinary firmness" from filing prison grievances. *See Dawes*, 239 F.3d at 493; *Gill*, 389 F.3d at 381. While Defendant does not dispute that the cell search occurred, he avers that none of Plaintiff's personal property was damaged, and that no water was discharged in his cell. But this is a dispute of fact that must be resolved by a jury. As the Second Circuit has instructed, the Court "is not permitted to make credibility determinations or weigh the evidence" on summary judgment; rather, the Court must "determine whether, as to any material issue, a genuine factual dispute exists." *Kee*, 12 F.4th at 166–67 (citations and internal quotation marks omitted).

### 3. *Causal Connection*

The Court also finds genuine disputes of material fact regarding the third element of Plaintiff's First Amendment retaliation claim. The causal connection required by this element requires the plaintiff to "introduce evidence sufficient to support the inference that the [protected activity] played a substantial part in the adverse action." *Brandon*, 938 F.3d at 40 (quoting *Davis*, 320 F.3d at 354). To do so, the plaintiff may "rely on circumstantial evidence, such as '(1) the temporal proximity between the protected activity and the alleged retaliatory act; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant concerning his motivation.'" *Burton v. Salerno*, No. 3:20-CV-1926 (VAB), 2023 WL 184238, at *8 (D. Conn. Jan. 13, 2023) (quoting *Merriweather v. O'Meara*, No. 917-CV-1129 (LEK) (TWD), 2018 WL 10038783, at *5 (N.D.N.Y. Feb. 16, 2018)). *See also Washington v.*

*Afify*, 681 F. App'x 43, 46 (2d Cir. 2017) (summary order) (explaining that, in addition to "temporal proximity between protected conduct and an adverse action," the plaintiff must produce "some further evidence of retaliatory animus" to survive summary judgment).

There is temporal proximity between Plaintiff's filing of grievances and a federal lawsuit and the search. The Second Circuit has held that an adverse action occurring "just days" after the plaintiff's protected activity raises a genuine dispute of fact about the causal connection. *Bennett*, 343 F.3d at 138; *see also Jordan v. Garvin*, No. 01 CIV 4393 (LTS) (GWG), 2004 WL 302361, at *6 (S.D.N.Y. Feb. 17, 2004) (reasoning that "the existence of a temporal connection as close as the one present here—just two days—is sufficient by itself to establish the requisite inference of a causal connection"). On the other hand, a district court in this Circuit held that a period of four months between a plaintiff's protected activity and the defendant's adverse action was insufficient to support an inference of a causal connection. *Freeman v. Goord*, No. 02 CIV. 9033 (PKC), 2005 WL 3333465, at *7 (S.D.N.Y. Dec. 7, 2005).

The temporal proximity here falls between those timeframes. As detailed above, during the first six months of the COVID-19 pandemic, Plaintiff engaged in a sustained pattern of regularly filing grievances and seeking to preserve video footage of correctional officers allegedly not complying with the DOC's COVID-19 protocols. The last of these activities were a Level 2 grievance he submitted on July 7, 2020, which was rejected on August 21, 2020, ECF No. 91-1 at 27, and a video preservation request he submitted in late August or early September of 2020, which was completed on September 11, 2020, ECF No. 91-2 at 7. These activities occurred some weeks before the allegedly retaliatory cell search on September 25, 2020, which suggests a somewhat tenuous causal connection. But Plaintiff also filed a federal lawsuit on September 1, 2020, against prison officials, and the search took place twenty-four days later. There is no bright-line rule

regarding the necessary temporal proximity to maintain a First Amendment retaliation claim; rather, this factor turns on the particular circumstances of the case. *See Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009) (finding that, under the unique circumstances of that case, "the passage of only six months between the dismissal of [the plaintiff's] lawsuit and" the defendant's allegedly retaliatory conduct was "sufficient to support an inference of a causal connection"). A reasonable jury could find that the temporal proximity here is made stronger by the fact that the last grievance and video preservation request punctuated a long pattern of Plaintiff engaging in protected activities over the course of several months, and a jury could reasonably infer a causal connection from the fact that only the twenty-four days passed between the filing of the federal suit and the search.

In addition, there are genuine disputes of material fact about whether Defendant made statements evincing retaliatory animus. As explained above, the parties dispute whether Defendant said "you think you[']r[e] smart filing grievances and law suits against us," and "you want to watch us[,] well we are watching you all," just before searching Plaintiff's cell. Pl.'s Decl. ¶¶ 17–18. If Plaintiff's version of events were credited by a jury, those statements would constitute direct evidence of retaliatory animus and thus a casual connection between Plaintiff's protected activity and Defendant's adverse action. *Washington*, 681 F. App'x at 46 (holding that summary judgment was improper where the plaintiff attested that the defendants "directly confronted him about his practice of filing grievances against prison officials," which constituted "direct evidence of retaliatory animus"). Although Defendant denies that he made those statements, this is a factual dispute the Court cannot resolve at summary judgment. *See id.*; *Kee*, 12 F.4th at 166–67.

Viewed together, the moderate temporal proximity between Plaintiff's pattern of protected activities and the disputed evidence of Defendant's retaliatory animus create a genuine dispute of

material fact as to whether Plaintiff's filing of grievances and a federal lawsuit "played a substantial part" in Defendant's alleged retaliatory cell search and destruction of property. *See Brandon*, 938 F.3d at 40. This genuine dispute of material fact precludes summary judgment in Defendant's favor.

## VI.   CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment, ECF No. 84, is DENIED. The Court will schedule a status conference to set dates for pretrial submissions and trial, and to consider the question of whether to appoint *pro bono* counsel for Plaintiff for the purposes of settlement discussions and trial.

**SO ORDERED** at Hartford, Connecticut, this 30th day of September, 2023.

 */s/ Sarala V. Nagala*
SARALA V. NAGALA
UNITED STATES DISTRICT JUDGE